Filed 5/30/23 P. v. Cortinas CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H047790 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1497382) |
| v. | |
| MOSES CORTINAS, | |
| Defendant and Appellant. | |

A jury found defendant Moses Cortinas guilty of first degree murder, attempted murder, and active participation in a criminal street gang. The jury further found true firearm allegations and gang allegations. The trial court imposed an aggregate term of life in prison with the possibility of parole, consecutive to terms of 30 years to life, 50 years to life, and 3 years.

Cortinas raises numerous claims on appeal. First, he contends the trial court erred by denying his motion to exclude portions of statements he made to the police. Second, he contends the evidence was insufficient to support a finding of willful, deliberate, and premeditated first degree murder. For the reasons below, we conclude these claims are without merit.

Third, Cortinas contends the gang-related conviction and enhancements must be vacated based on the retroactive application of Assembly Bill No. 333 (Assembly Bill 333). Fourth, he contends the trial court improperly imposed a term of 20 years to life instead of 20 years for one of the firearm enhancements. Fifth, he contends we must

vacate the criminal justice administration fee based on recently enacted legislation. The Attorney General concedes the merits of these claims, and we accept the concessions.

We will reverse the judgment and remand to the trial court for further proceedings.

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. Procedural Background

In 2018, the prosecution charged Cortinas with four counts: count 1—murder (Pen. Code, § 187)[1]; count 2—attempted murder (§§ 664, subd. (a), 187); count 3—first degree burglary (§§ 459, 460, subd. (a)); and count 4—participating in a criminal street gang (§ 186.22, subd. (a)). As to counts 1, 2, and 3, the prosecution alleged Cortinas committed the offenses for the benefit of, at the direction of, and in association with a criminal street gang. (§ 186.22, subds. (b)(1)(C) & (b)(5).) As to counts 1 and 2, the prosecution alleged Cortinas personally discharged a firearm causing the death of a person other than an accomplice (§ 12022.53, subd. (d)). As to count 3, the prosecution alleged a person was present in the residence during the offense, and that Cortinas personally used a firearm in the commission of the offense. (§§ 667.5, subd. (c)(21), 12022.5, subd. (a).) Finally, the prosecution alleged Cortinas had served a prior prison term. (§ 667.5, subd. (b).)

The trial court granted the prosecution's motion to dismiss count 3 (first degree burglary) for insufficient evidence, as well as the allegations on count 3. The jury found Cortinas guilty of willful, deliberate, and premeditated first degree murder on count 1, and found him guilty on counts 2 and 4 as charged. The jury found true all remaining firearm and gang allegations, and the trial court granted the prosecution's motion to dismiss the prior prison term allegation.

The trial court imposed an aggregate term of life in prison with the possibility of parole, consecutive to terms of 30 years to life, 50 years to life, and 3 years. The terms

---

[1] Subsequent undesignated statutory references are to the Penal Code.

consisted of 50 years to life on count 1 (25 years to life for first degree murder plus 25 years to life for the firearm enhancement), life with parole consecutive to 30 years on count 2 (life with parole for attempted murder plus 20 years for the firearm enhancement and 10 years for the gang enhancement), and three years on count 4.

### B. Facts of the Offenses

On November 4, 2014, Moses Cortinas shot and killed Juan Guillen and nonfatally shot Manuel Castillo. Guillen, Castillo, and another man were "hanging out" in a vacant apartment when Cortinas and Jose Quiroz, Sr. (Senior) entered the apartment by kicking open the door. Cortinas said, "What's up? You guys are scrapas?" Cortinas then began shooting at Castillo, but Castillo escaped out a window after a bullet grazed his stomach. Cortinas then fatally shot Guillen, who had been hiding. Cortinas claimed he shot Guillen after Guillen attacked him with a pole. A gang expert testified that Cortinas and Senior were members of a Norteño gang, and that they committed the offenses with the intent to retaliate against Sureño gang members for a prior altercation with Senior the week before this attack.

Senior testified for the prosecution. He had been "jumped into" the El Hoyo Palmas (EHP) gang when he was around 15 or 16 years old. He considered the gang "Norteño-affiliated" and he testified that he was a "first generation" member. He met Cortinas around 2009 when they were in custody together. Cortinas told Senior that he (Cortinas) was a fifth generation EHP member.

In 2014, Senior had a son, Jose Quiroz, Jr. (Junior), who was experiencing "pressure" in the form of Sureño gang activity. Junior had never been jumped into a gang, but he associated with Norteños and "put himself a little bit out there as a Northerner." Sureños wrote graffiti on Junior's mother's walls and broke her windows in an attempt to provoke Junior. After Sureños repeatedly broke Junior's car windows, Senior "felt compelled to have to do something about it." Senior believed the harassment was coming from a young group of Sureños in the Via Monte area.

3

On October 24, 2014, Senior, Junior, Cortinas, and another man drove to Via Monte to look for the Sureños who had been harassing Junior. Cortinas was wearing a blue jersey to make himself look like a Southerner in an attempt to "bring some out." Senior saw someone he believed to be a Southerner and confronted the man. The man tried to run, but Senior stabbed him in the back with a small pocketknife. After that event, the conflict between the two groups escalated, and the Southerners retaliated at Junior's mother's residence, breaking her windows and tagging her apartment. In the following days, Senior and Cortinas exchanged text messages with each other about the conflict.

On November 4, 2014, Senior got a call from Junior, who wanted to buy some marijuana in the Via Monte area. Senior knew there were Southerners in the area, so he agreed to go with Junior to "[m]ake sure nobody fucks with him." Cortinas volunteered to go with them. After they got the marijuana, the man who gave it to them told them, "Hey, you know those guys that broke your windshield, they're right there," indicating a nearby apartment building. Senior said, "I'm going to talk to these guys," and got out of the car. Cortinas got out and followed Senior. They saw someone in a carport, and the person told them there were Southsiders partying upstairs in an empty apartment. Senior and Cortinas went upstairs and looked through a window into the apartment, where Senior saw someone scrambling around. Senior thought the person was a Sureño.

Senior kicked open the door, entered the apartment, and yelled out, "Hey." Cortinas entered the apartment behind Senior. Senior saw someone scrambling around in the back and Cortinas began shooting. Senior saw a young man jumping headfirst out of a window. Cortinas fired two shots at him. Senior then ran out of the apartment, and he heard three more shots fired. Junior had backed the car into the neighboring alley, so Senior got in and told him, "Let's go, let's go. Let's get the fuck out of here." While Junior was fumbling with the keys, Cortinas got into the car as well. Senior asked Cortinas, "What the fuck did you do?" Cortinas responded, "I shot two of them."

4

Cortinas said he had gone into a back room, and one of the occupants had hit him with a stick, so Cortinas shot him.

The police later interviewed Cortinas twice. After initially lying about his whereabouts and claiming another person was responsible for the shootings, Cortinas admitted he had been the shooter. He claimed Senior pressured him into it. Cortinas admitted he fired two shots at the man who jumped out the window, and when he (Cortinas) walked into a back bedroom, he was hit with a two-by-four by a second man he had seen. Cortinas admitted he shot at the man and ran out of the apartment. He fired five shots total.

Cortinas testified in his defense. He testified that Senior had directed him (Cortinas) to go with them to get the marijuana in Via Monte, and that he felt he had no choice. Cortinas knew about the stabbing incident the prior week because he was present at the incident. Senior had given him a gun after the incident, and Cortinas saw that it was loaded with five rounds. Cortinas admitted he had it in his pocket when they were approaching the apartment. He testified that Senior kicked open the door and motioned for Cortinas to enter. Cortinas saw some rapid movement in a hallway and fired the gun two times in the direction of the movement. Cortinas denied he intended to hit anyone. Cortinas saw the man jump out a window and he walked towards a back bedroom, whereupon he was hit with a heavy stick or pole. Cortinas testified that out of a reflex reaction, he started firing off multiple shots. He denied that he intended to shoot anyone and denied he even saw anyone.

## II. DISCUSSION

### A. *The Denial of Cortinas's Motion to Exclude His Statements to Police*

Cortinas contends the trial court erred by denying his pretrial motion to exclude certain portions of his statements to the police on the ground that he had invoked his right to remain silent during one of the interviews. The Attorney General contends the trial

court properly admitted the challenged portions of the statements because Cortinas did not unambiguously invoke his right to remain silent.

### 1. Factual and Procedural Background

The police interviewed Cortinas twice—first in November 2014, and again in December 2014. At the start of the November 2014 interview, the police advised Cortinas of his *Miranda*[2] rights and he verbally acknowledged that he understood them. He then began answering the officers' questions, and when they asked him where he was on the afternoon of November 4 (at the time the offenses occurred), Cortinas told them he was sitting on a bench in a park. He said Senior gave him a ride to the park but claimed he (Cortinas) did not see Junior that day. When the police told Cortinas they were talking to Junior and Senior, who told them Cortinas was with them that afternoon, Cortinas then said he had "mixed up" things and that he was actually at his cousin's house that afternoon.

About 40 minutes into the interview, after the officers continued to question Cortinas about what he was doing that afternoon, the following exchange took place:

"[Cortinas:] I'm just saying, sir, like I'm not trying to bullshit you guys about nothing dude, and--

"[Detective:] Well there's one thing I -- I -- you are bullshitting me about--

"[Cortinas:] Alright.

"[Detective:] --is that--

"[Cortinas:] I won't talk no more. It's cool. [Unintelligible.]

"[Detective:] --you tell me that--

"[Cortinas:] I won't talk no more.

"[Detective:] What do you mean you won't talk no more?

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

6

"[Cortinas:]  I won't talk no more.  Like I'm, I'm, I'm just trying to like, like I'm not trying dick you guys, be like, I understand whatever you's trying to figure out, I don't know, but, and I'm just trying to get, give you guys everything straight up dude.

"[Detective:]  I'm trying to get, I'm trying to get what happened on -- I'm trying to get you to admit that um, that you and, and Junior and Senior were together on Tuesday.

"[Cortinas:]  I don't remember, I like, I don't remember that honestly and I mean I don't know, like I said I got a lot of shit going on."[3]

Cortinas then continued to answer the officers' questions.

The police interviewed Cortinas again in December 2014, and they advised him of his *Miranda* rights at the start of the interview.  Cortinas verbally acknowledged that he understood his rights and continued to answer questions.

Cortinas moved in limine to exclude his statements to the police.  He argued that the *Miranda* admonitions were inadequate, that he did not expressly waive his rights, and that he had invoked his right to remain silent during the first interview.  The prosecution argued Cortinas impliedly waived his rights by continuing to answer questions after being admonished, and that he did not unambiguously invoke his right to remain silent.

The trial court found Cortinas had been adequately admonished and impliedly waived his *Miranda* rights.  The court found no evidence of coercion, nor any evidence Cortinas did not understand his rights.  As to Cortinas's statements that he did not want to talk any more, the court found he made the initial statement because he was frustrated by the officers' refusal to believe his claims about where he was at the time of the offenses.  As to the officer's response, "What do you mean you won't talk no more," the court found "the officer's question appeared to have been calculated toward determining whether the defendant was attempting to invoke the right to remain silent rather than

---

[3] Our transcription of this exchange is based on the video recording of the interview, not the transcription set forth in the related exhibits.  Any differences are immaterial to this analysis.

7

toward coercing him to answer more questions." The court acknowledged that the statement, "I won't talk no more," would likely be an adequate invocation of the right not to speak if considered in isolation, but that viewing the statements in context, Cortinas made them "out of frustration or a desire to stick with his story that he was not involved with the murder and attempted murder." On these grounds, the court ruled there was no *Miranda* violation and denied the motion to exclude the statements.

### 2. *Legal Principles*

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself . . . ." (U.S. Const., 5th Amend.) "Prior to any questioning, the person must be warned that he [or she] has a right to remain silent, that any statement he [or she] does make may be used as evidence against him [or her], and that he [or she] has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he [or she] indicates in any manner and at any stage of the process that he [or she] wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he [or she] does not wish to be interrogated, the police may not question him. The mere fact that he [or she] may have answered some questions or volunteered some statements on his or [her] own does not deprive him [or her] of the right to refrain from answering any further inquiries until he [or she] has consulted with an attorney and thereafter consents to be questioned." (*Miranda*, *supra*, 384 U.S. at pp. 444-445.)

"If a defendant invokes his [or her] *Miranda* rights, questioning must cease." (*People v. Sanchez* (2019) 7 Cal.5th 14, 49 (*Sanchez*).) "However, when, as in this case, a defendant has waived his [or her] *Miranda* rights and agreed to talk with police, any subsequent invocation of the right to counsel or the right to remain silent must be unequivocal and unambiguous." (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 381.) "A

8

requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that 'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity. [Citation.]" (*Ibid.*) The test is whether the invocation was "articulated sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be an invocation of such rights." (*People v. Nelson* (2012) 53 Cal.4th 367, 380.) "[T]he question of ambiguity in an asserted invocation must include a consideration of the communicative aspect of the invocation—what would a *listener* understand to be the defendant's meaning." (*People v. Williams* (2010) 49 Cal.4th 405, 428 (*Williams*).)

The prosecution bears the burden of proof by a preponderance of the evidence to show the statements were admissible. (*Sanchez*, *supra*, 7 Cal.5th at p. 48.) "On appeal, we review independently the trial court's legal determinations of whether a defendant's . . . *Miranda* waivers were knowingly, intelligently, and voluntarily made [citation], and whether his later actions constituted an invocation of his right to silence [citation]. We evaluate the trial court's factual findings regarding the circumstances surrounding the defendant's statements and waivers, and " ' "accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence." ' " (*People v. Rundle* (2008) 43 Cal.4th 76, 115 (*Rundle*), disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390.)

### 3. *The Trial Court Did Not Err in Denying the Motion to Exclude*

The Attorney General does not dispute that the interrogations were custodial for purposes of the *Miranda* analysis. Cortinas does not dispute that the initial *Miranda* warnings were adequate, or that he understood and voluntarily waived them at the initiation of the November interview. The sole issue is whether he unambiguously invoked his right to remain silent in the exchange quoted above, such that officers were required to stop questioning him.

Our assessment of the record accords with the trial court's findings. Viewing Cortinas's statements in isolation and in transcript form, his assertion that "I won't talk no more," could constitute an adequate and unambiguous invocation of the right to remain silent. Upon viewing the video of the interview, however, the context shows that a reasonable police officer in those circumstances would not have understood the statement to be such an invocation. After Cortinas told the officers he was at a park during the relevant time period, the officers continued to question him on his whereabouts and told him they had information contradicting his claims. Cortinas changed his story, feigned confusion about where he was at the time of the offenses, and asserted he was "not trying to bullshit you guys." When the detective refused to accept this and responded, "Well there's one thing . . . you are bullshitting me about," Cortinas reacted with, "Alright . . . I won't talk no more." The video of the exchange shows Cortinas's body language, tone of voice, and the timing of the exchange, which objectively show he was not seriously invoking his right to remain silent. Rather, it appears Cortinas was reacting out of anger or frustration with the officers' refusal to believe him—what the trial court described as "frustration or a desire to stick with his story."

The detective asked Cortinas what he meant—an objectively reasonable attempt to determine whether Cortinas was actually invoking his right to remain silent. "In certain situations, words that would be plain if taken literally actually may be equivocal under an objective standard, in the sense that *in context* it would not be clear to the reasonable listener what the defendant intends. In those instances, the protective purpose of the *Miranda* rule is not impaired if the authorities are permitted to pose a limited number of followup questions to render more apparent the true intent of the defendant." (*Williams*, *supra*, 49 Cal.4th at p. 429.)

Although Cortinas then repeated his statement, "I won't talk no more," he *immediately continued to talk*, asserting, "I'm not trying dick you guys," and "I'm just

10

trying to get, give you guys everything straight up." After this, he continued to answer officers' questions about where he was and who he was with. Given the overall context and brevity of the exchange, a reasonable police officer in those circumstances would not have understood Cortinas's statements to be an unambiguous invocation of the right to remain silent. "A defendant has not invoked his or her right to silence when the defendant's statements were merely expressions of passing frustration or animosity toward the officers, or amounted only to a refusal to discuss a particular subject covered by the questioning." (*Rundle, supra*, 43 Cal.4th at p. 115.)

Cortinas's statements are analogous to those of the defendant in *Sanchez, supra*, 7 Cal.5th 14. In *Sanchez*, the police were interviewing the defendant with the objective of giving him a "voice stress analyzer" test. (*Id.* at p. 47.) He agreed to submit to questioning in preparation for the test and waived his *Miranda* rights. Later in the interview, the defendant demanded that the police administer the voice test, and when the officer did not comply, the defendant responded, "I'm not going to say nothing more. I told you the truth. That's the truth." (*Id.* at p. 48.) The California Supreme Court held this did not constitute an unambiguous invocation because viewed in context the statement was instead an expression of impatience to take the voice stress analyzer test. (*Id.* at p. 50.) Relying on *Williams* and *Rundle, supra*, the Court emphasized the importance of viewing the statement in context and considering from an objective standpoint how a listener in the questioner's situation would understand the defendant's statement.

The same analysis applies here, and we reach the same conclusion the trial court did: Cortinas's statements were not an unambiguous invocation of the right to remain silent, but rather an expression of frustration or a similar reaction to officers' refusal to accept his version of events. Accordingly, we conclude the trial court did not err in denying the motion to exclude the statements.

11

*B. Sufficiency of the Evidence for Willful, Deliberate, and Premeditated Murder*

Cortinas contends the evidence was insufficient to support his conviction for first degree murder because the record does not hold substantial evidence of deliberation and premeditation in his killing of Guillen. The Attorney General argues the evidence shows Cortinas committed the killing as the result of a planned retaliatory attack against gang members, supporting a finding of premeditation.

*1. Legal Principles*

"To assess the evidence's sufficiency, we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357, citing *People v. Maury* (2003) 30 Cal.4th 342, 403.) The record must disclose substantial evidence to support the verdict such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Ibid.*) The substantial evidence must be reasonable, credible, and of solid value. (*Ibid.*) We review the evidence "in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*Ibid.*) "A reversal for insufficient evidence 'is unwarranted unless it appears that upon no hypothesis whatever is there sufficient substantial evidence to support' the jury's verdict." (*Ibid.*) The standard is the same under both the California Constitution and the federal Constitution. (*People v. Jimenez* (2019) 35 Cal.App.5th 373, 392.)

"An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." (*People v. Stitely* (2005) 35 Cal.4th 514, 543.) "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation does not require any extended period of time. "The true test is not the duration of time as much as

12

it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." [Citations.]' '' (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) Evidence of "planning activity" is relevant to show premeditation. (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) Planning activity consists of facts about how and what the defendant did before the killing that show the defendant was engaged in activity directed toward, and intended to result in, the killing. (*Ibid.*)

### 2. *Substantial Evidence Supported a Finding of Premeditation and Deliberation*

Cortinas concedes the evidence shows he carried a gun from the car to the apartment, supporting an inference "he considered the possibility there might be a violent encounter." (See *People v. Lee* (2011) 51 Cal.4th 620, 636 [evidence of premeditation included fact that defendant brought a loaded handgun with him on the night the victim was killed].) He acknowledges he fired multiple shots at Guillen in rapid succession, but he argues he was unaware of Guillen's presence in the apartment, and that he only became aware of his presence when Guillen hit him with a pole.

The Attorney General points to multiple factors supporting findings of planning and premeditation based on evidence that Cortinas and the others had a gang-related motive for the killing. The Attorney General argues the evidence shows this was a planned retaliation against Sureño gang members in response to Sureños who had previously been harassing Junior. A week before the killing of Guillen, Cortinas went to Via Monte with Junior and Senior, where Senior stabbed in a man in the back, thinking the man was a Sureño. The Attorney General points to text messages between Cortinas and Senior on this date and three days later as evidence of plans to retaliate. On the day of the killing, Cortinas knew they were going to Sureño territory with the potential to retaliate, and Cortinas had armed himself with a loaded gun in anticipation of an attack. Senior testified that he had told Cortinas about his (Senior's) plan to go with Junior to Via Monte, and that Cortinas volunteered to go with them. Just prior to the shootings,

13

Senior and Cortinas were informed of the possible presence of Sureños in the apartment. They entered the apartment to look for the Sureños, and upon entering, Cortinas said, "You guys are scrapas?" before opening fire.

Based on this evidence, a jury could reasonably infer that Cortinas purposefully armed himself with a loaded gun before the group drove to Via Monte for the purpose of retaliating against Sureños. This was sufficient evidence of planning to support a finding of premeditation and deliberation. Cortinas attempts to distinguish between his shooting at Castillo and killing of Guillen, but the jury could reasonably infer that Cortinas entered the apartment with a plan to kill anyone inside, regardless of whether it was Castillo or Guillen. This inference was well-supported by the manner in which Cortinas fired at Castillo and followed him to the window from which Castillo had exited. The jury could reasonably infer that Cortinas planned to shoot at anyone he could find, and this inference is not necessarily negated by the fact that Guillen may have gone undetected, allowing him to catch Cortinas by surprise before Cortinas could shoot at him.

For the reasons above, we conclude this claim is without merit.

### C. *Remand for Retrial on Gang-Related Charges*

Cortinas contends we must vacate the gang-related findings—the conviction on count 4 (active participation in a criminal street gang) and the true findings on the gang enhancements for counts 1 and 2—based on the retroactive application of Assembly Bill 333. The Attorney General concedes that Assembly Bill 333 applies retroactively and that we must vacate the conviction and enhancements, remanding for possible retrial. The concession is well-taken.

"Assembly Bill 333 made the following changes to the law on gang enhancements:  First, it narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' (§ 186.22, subd. (f), italics added.) Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern

14

of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. (§ 186.22, subd. (f), italics added.) Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than the currently charged offense. (§ 186.22, subd. (e)(1), (2).) Fourth, Assembly Bill 333 narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any 'common benefit' be 'more than reputational.' (§ 186.22, subd. (g).)" (*People v. Tran* (2022) 13 Cal.5th 1169, 1206 (*Tran*).)

Under the rule of *In re Estrada* (1965) 63 Cal.2d 740, these amendments apply retroactively to Cortinas's case because his trial occurred prior to the enactment of Assembly Bill 333 and his conviction is not yet final. (*Tran, supra*, 13 Cal.5th at p. 1207.) "When a substantive change occurs in the elements of an offense and the jury is not instructed as to the proper elements, the omission implicates the defendant's right to a jury trial under the Sixth Amendment, and reversal is required unless 'it appears beyond a reasonable doubt' that the jury verdict would have been the same in the absence of the error. [Citation.]" (*Ibid.*) The burden is on the Attorney General to make that showing, but he declines to do so here. Accordingly, we will vacate the conviction on count 4 and the gang enhancements on counts 1 and 2, and we will remand to give the prosecution the opportunity to retry them.

### D. *Improper Term Imposed for the Firearm Enhancement on Count 2*

Cortinas contends the trial court incorrectly imposed a term of 20 years to life for the firearm enhancement on count 2 (attempted murder charge), and that the correct term

15

should have been 20 years. The Attorney General concedes the correct term should be 20 years under the applicable statute, and he asks that we correct the abstract. The concession is well-taken, but because the trial court orally imposed the term at sentencing, we will vacate it and order the trial court to impose the correct term.

On count 2, the jury found true the allegation that Cortinas personally and intentionally discharged a firearm during the commission of the offense under section 12022.53, subdivision (c). The jury found not true the allegation that he personally and intentionally discharged a firearm causing great bodily injury under subdivision (d) of that section. The proper term for the enhancement should have been 20 years in prison. (§ 12022.53, subd. (c).) At sentencing, the trial court orally imposed a term of "20 years to life under Penal Code section 12022.53(c)." The abstract of judgment lists a term of "20 to life" for this enhancement. However, the trial court correctly stated the total term for this count as well as the aggregate term for all counts.

In any event, because we must remand this matter for the reasons above, we will vacate the term of 20 years to life on this enhancement and order the trial court to impose the correct term of 20 years at resentencing.

### E. Retroactive Application of Assembly Bill No. 1869

The trial court imposed a $129.75 criminal justice administration fee under Government Code sections 29550, 29550.1, and 29550.2. Cortinas contends we must vacate the fee based on the newly enacted Assembly Bill No. 1869 (Assembly Bill 1869). The Attorney General concedes this claim. We accept the concession insofar as the fee must be modified, but the new law does not empower us to strike it in its entirety.

Effective July 1, 2021, Assembly Bill 1869 revised Government Code section 611, which now provides, "On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to . . . [Government Code] [s]ections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Gov. Code, § 6111,

16

subd. (a).) "[B]y its plain terms the ameliorative changes of Assembly Bill 1869 apply retroactively to make any unpaid portion of the identified assessments, as they existed on June 30, 2021, 'unenforceable and uncollectible' as of July 1, 2021. (Stats. 2020, ch. 92, §§ 11, 62.)." (*People v. Greeley* (2021) 70 Cal.App.5th 609, 626.) "[A]lthough the unpaid balance of the identified fees is no longer enforceable and collectible, the statute also mandates that any portion of a judgment imposing those fees be vacated. Accordingly, based on the plain language of the statute, the unpaid balance of the probation supervision and criminal justice administration fees must be vacated." (*Id.* at pp. 626-627, fns. omitted.)

The record does not show what portion of the criminal justice administration fee, if any, remained unpaid as of July 1, 2021. Accordingly, we will order the trial court on remand to vacate the portion of the judgment requiring payment of any balance on the criminal justice administration fee that remained unpaid as of July 1, 2021.

## III.    DISPOSITION

The judgment is reversed. The conviction on count 4 is vacated, the true findings on counts 1 and 2 as to the gang-related enhancements under section 186.22 are vacated, and the term of 20 years to life for the firearm enhancement under subdivision (c) of section 12022.53 on count 2 is vacated. The matter is remanded to the trial court for further proceedings. On remand, the trial court shall vacate any portion of the $129.75 criminal justice administration fee that remained unpaid as of July 1, 2021, and for the firearm enhancement under subdivision (c) of section 12022.53 on count 2, the court shall impose a term of 20 years in state prison.

17

_____

Greenwood, P. J.

WE CONCUR:

_____

Grover, J.

_____

Bromberg, J.

H047790 People v. Cortinas